# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FRANCISCA M. LONG,

                     Plaintiff,

v.

ALPHA MEDIA, LLC,

                     Defendant.

Case No. 24-2400-DDC

## MEMORANDUM AND ORDER

Defendant Alpha Media, LLC has filed a summary judgment motion against plaintiff Francisca Long's claims for sex discrimination, retaliation, and a hostile work environment (Doc. 37). At summary judgment, the court views the facts in the light most favorable to plaintiff. Considered in that light, the summary judgment facts don't paint a pretty picture for defendant.

Plaintiff's boss, Larry Riggins, made a "dumb slut" comment to plaintiff. A mere month and a half later, Riggins—whom the court must assume is biased, given the slur he used—drove the decision to fire plaintiff. Defendant insists that it fired plaintiff for a non-discriminatory reason: members of plaintiff's team complained about her and four left the company within six months. Yet Riggins served as the conduit for those complaints. And, when Riggins brought these complaints to his boss and human resources, no one reviewed any documents or investigated Riggins's claims.

Because Riggins's bias arguably infected every critical moment in this case's facts, a reasonable factfinder could conclude that defendant harbored an improper, discriminatory motive

when it terminated plaintiff. A reasonable factfinder also could conclude that defendant retaliated against plaintiff for reporting Riggins's derogatory comment. But no reasonable factfinder could conclude that defendant subjected plaintiff to a hostile work environment. The court thus grants summary judgment against plaintiff's hostile work environment claim. But it denies the rest of defendant's motion.

The court explains these conclusions, below, starting with the relevant facts.

## I.    Background

Plaintiff began working for defendant as a sales manager in January 2018, and Riggins supervised her for the entirety of her employment. Doc. 36 at 2 (PTO ¶ 2.a.ii., iii.); Doc. 38-3 at 3 (Ex. 2). Defendant promoted plaintiff to director of sales in April 2018 at Riggins's recommendation. Doc. 38-3 at 3 (Ex. 2). As director of sales, plaintiff supervised a team of sales associates. Doc. 38-2 at 6 (Pl. Dep. 37:5–8).

### *Complaints About Plaintiff in 2018 and 2019*

In August 2018, Riggins claimed to notice that plaintiff had a negative attitude. Doc. 38-6 at 2 (Riggins Decl. ¶ 6). Riggins documented those concerns, *id.* at 3 (Riggins Decl. ¶ 7), but never shared them with plaintiff, Doc. 41-26 at 2 (Pl. Aff. ¶¶ 4–5).[1]

---

[1]    Defendant asks the court to disregard this statement from plaintiff's affidavit because it's "self-serving." Doc. 46 at 6. The court declines defendant's invitation. A "nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012) ("So long as an affidavit is based upon personal knowledge and sets forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature." (quotation cleaned up)). And plaintiff's statement here meets that standard. Plaintiff has personal knowledge about the things Riggins shared with her. And the court doesn't view plaintiff's affidavit as conclusory.

Defendant raises this same objection elsewhere, insisting that plaintiff can't controvert facts with a "self-serving" affidavit. Doc. 46 at 7, 8, 10, 12. But that's not right. The standard provides that a plaintiff can't rely on an affidavit that's both self-serving *and* conclusory. *Hall*, 935 F.2d at 1111; *see also Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019) ("Even standing alone, self-serving testimony can suffice to prevent summary judgment."). Under defendant's view, no plaintiff could ever

Similarly, in July 2019, another employee told Riggins that five employees had complained to her about plaintiff's unprofessional behavior. Doc. 38-6 at 3 (Riggins Decl. ¶ 9). These concerns didn't make it to plaintiff, either. Doc. 41-26 at 3 (Pl. Aff. ¶ 6). Riggins met with all five employees who had reported that plaintiff was, among other things, passive/aggressive, controlling, inconsistent, and confrontational. Doc. 38-6 at 11 (Riggins Decl. Ex. B). According to Riggins, three of the five said that they would quit if plaintiff didn't improve. *Id.* Based on these complaints, Riggins met with plaintiff and told her that other employees had issues with her behavior. Doc. 38-2 at 26 (Pl. Dep. 101:6–19). During the meeting, Riggins gave plaintiff an "Employee Warning Notice" dated July 18, 2019. Doc. 38-6 at 3 (Riggins Decl. ¶ 13); *id.* at 13 (Riggins Decl. Ex. C).[2]

The Employee Warning Notice described behavioral issues—resembling those issues that the five employees had reported to Riggins—and provided that these behaviors should never happen again. *Compare* Doc. 38-6 at 13 (Riggins Decl. Ex. C), *with id.* at 11 (Riggins Decl. Ex. B). And the Employee Warning Notice included a plan for improvement. *Id.* at 13 (Riggins

---

submit an affidavit at summary judgment. *See Greer*, 943 F.3d at 1325 ("[V]irtually any party's testimony can be considered 'self-serving,' and self-serving testimony is competent to oppose summary judgment."). The court rejects this notion. It's self-evident. A plaintiff's affidavit will serve the plaintiff. The court thus declines to disregard plaintiff's affidavit because it's "self-serving." And it notes that defendant hasn't utilized the usual mechanism for countering a plaintiff's affidavit—*i.e.* arguing it's a sham affidavit. *See, e.g.*, *Hampton v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1134 (D. Kan. 2020) (applying sham affidavit factors).

[2]     Riggins testified that, when he gave plaintiff the Employee Warning Notice, he also gave plaintiff notes from his conversations with other employees. Doc. 38-6 at 4 (Riggins Decl. ¶ 15). Plaintiff disputes this assertion, claiming she never received "any documentation indicating that he had spoken with any employees about [her] behavior." Doc. 41-26 at 3 (Pl. Aff. ¶ 7). At summary judgment, the court must adopt plaintiff's view of these competing versions of events, since it is supported by her affidavit. True, she admitted to receiving an "attachment" with the Employee Warning Notice. Doc. 46-2 at 2 (Reply Ex. 1). But the court can't find that it's undisputed that the attachment was Riggins's notes. So, it adopts plaintiff's view of things, as it must. This doesn't get plaintiff very far, though, because plaintiff doesn't dispute that she received the Employee Warning Notice itself, and it contains the same behavioral concerns listed in Riggins's notes. *See* Doc. 38-6 at 13 (Riggins Decl. Ex. C.).

Decl. Ex. C). As relevant here, the plan called for Riggins to provide plaintiff with additional leadership mentoring and move his office next to plaintiff's.[3] *Id.* Riggins moved his office next to plaintiff, Doc. 46-2 at 2 (Reply Ex. 1), but the so-called mentorship was infrequent, and eventually ended, Doc. 41-26 at 3 (Pl. Aff. ¶ 8).

Plaintiff notified a company executive about the Employee Warning Notice. Doc. 41-4 at 8 (Pl. Dep. 97:20–25). The executive that plaintiff contacted was shocked and appalled. *Id.* at 9 (Pl. Dep. 98:1–10). The executive told plaintiff that plaintiff needed to decide whether to get the executive involved because the Employee Warning Notice "was supposed to be an underground write-up." *Id.* That is, Riggins intended the Employee Warning Notice to serve as a "wake-up call"—that no one else needed to know about—because he didn't want to put a target on plaintiff's back. *Id.* (Pl. Dep. 98:11–19). The Employee Warning Notice never was added to plaintiff's personnel file. *Id.* (Pl. Dep. 100:10–17).

A few months later, in October 2019, Riggins received complaints about plaintiff from three more employees. Doc. 38-6 at 4 (Riggins Decl. ¶¶ 16–18). According to Riggins, one employee complained that plaintiff was overbearing and telling his staff how to do their jobs, so "they were tired of having to deal with her." *Id.* (Riggins Decl. ¶ 16). Plaintiff never learned about this complaint. Doc. 41-26 at 3 (Pl. Aff. ¶ 9). A second employee told Riggins that

---

[3]     At her deposition, plaintiff claimed that the original plan didn't include Riggins moving his office next to hers. Doc. 41-4 at 8 (Pl. Dep. 95:18–96:9). Defense counsel asked her to produce this original document. *Id.* The summary judgment record doesn't contain the original document that, according to plaintiff, still exists. To the contrary, the record includes a letter that plaintiff wrote in response to the Employee Warning Notice. Doc. 46-2 at 2 (Reply Ex. 1). And that contemporaneous letter mentions Riggins moving his office as part of the plan. *Id.* The court thus concludes that the Employee Warning Notice's performance improvement plan—the one plaintiff received—included Riggins moving his office near her. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

plaintiff belittled her, made her feel stupid, and told her she was "not even a half-assed employee." Doc. 38-6 at 4 (Riggins Decl. ¶ 17). Plaintiff denies calling this employee a "half-assed employee." Doc. 41-4 at 7 (Pl. Dep. 90:3–15). Plaintiff never learned about this second employee's complaints, either. Doc. 41-26 at 3 (Pl. Aff. ¶ 10). And a third employee told Riggins that plaintiff had called him an "asshole." Doc. 38-6 at 4 (Riggins Decl. ¶ 18). Continuing the pattern, plaintiff never learned about this complaint. Doc. 41-4 at 6 (Pl. Dep. 89:8–13). Riggins claims he met with plaintiff to discuss these complaints, Doc. 38-6 at 5 (Riggins Decl. ¶ 19), but plaintiff maintains she never learned about them. Plaintiff also testified that she doesn't recall calling the third employee an "asshole." Doc. 41-4 at 6 (Pl. Dep. 89:20–22).

### *2023 Issues*

After these dustups, all remained quiet—until 2023. In February 2023, plaintiff and Riggins argued in a sales meeting in front of the sales team. Doc. 38-9 at 2 (Arville Decl. ¶ 4). In plaintiff's telling, Riggins screamed at her for 45 solid minutes. Doc. 41-4 at 14 (Pl. Dep. 206:14–207:18). After the meeting, a human resources employee interviewed one of plaintiff's employees, Dan Lindquist, who said the argument began when Riggins declared that the sales staff needed to return to the office, which blindsided plaintiff. Doc. 41-11 at 2 (Ex. J). Lindquist also complained about Riggins as a manager and called plaintiff "such a great manager." *Id.*

Responding to this meeting kerfuffle, Regional President Zoe Burdine-Fly and Director of Human Resources Susan Arville met with plaintiff and Riggins. Doc. 36 at 2 (PTO ¶ 2.a.iv.). At the meeting, the two impressed upon plaintiff and Riggins the need to put aside their disagreements and work together. Doc. 38-8 at 3 (Burdine-Fly Decl. ¶ 6). And they told plaintiff that employees had complained both about her and Riggins. Doc. 38-2 at 19–20 (Pl. Dep. 90:20–91:4). A week later, Burdine-Fly emailed plaintiff and Riggins, recounting the

meeting and laying out expectations for the future. Doc. 38-10 at 2 (Ex. 9). To plaintiff, Burdine-Fly wrote, "you have been an amazing driving force behind Topeka's revenue successes. Your team, both admires and is intimidated by you. Let's work on providing a consistent work environment where everyone feels comfortable interacting with you all the time." *Id.* Around this time, Arville met with one of plaintiff's direct reports, Shayla Andrade, who said that she felt bullied by plaintiff and that plaintiff had very little respect for her employees. Doc. 38-9 at 3 (Arville Decl. ¶ 6).

Andrade quit in March 2023. Doc. 38-6 at 5 (Riggings Decl. ¶ 21). Another of plaintiff's direct reports, Trinity Larkin, left in April 2023. *Id.* (Riggins Decl. ¶ 22). In their resignation letters, neither Andrade nor Larkin mentioned plaintiff as the reason for their departure. Doc. 41-17 at 2 (Ex. P); Doc. 41-18 at 2 (Ex. Q). But Larkin told the Regional Business Manager that she was leaving her employment with defendant because plaintiff was disrespectful and bullied her.[4] Doc. 38-11 at 2 (Bianchi Decl. ¶ 6).[5] Larkin also told Arville that she was leaving in part due to her issues with plaintiff. Doc. 38-9 at 3 (Arville Decl. ¶ 8).

---

[4]      In her summary judgment response, plaintiff disputes that she bullied Larkin. Doc. 41 at 5. But plaintiff doesn't support this assertion with any evidence in the record. The lack of record support dooms plaintiff's attempt to dispute this summary judgment fact. D. Kan. Rule 56.1(b)(1) (requiring non-movant seeking to dispute movant's facts to "refer with particularity to those portions of the record upon which the opposing party relies"); Fed. R. Civ. P. 56(c)(1) (requiring parties to support summary judgment facts by "citing to particular parts of the materials in the record"); *Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that, on a motion for summary judgment, "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record" and the district court has no obligation "to comb the record in order to make the [party's] arguments for him" (quotation cleaned up)).

[5]      Plaintiff objects to the use of Bianchi's declaration, claiming that defendant didn't disclose her as a witness on its Rule 26 disclosures. Doc. 41 at 5. Plaintiff also complains that defendant didn't identify Bianchi in its interrogatory responses. *Id.* The problem for plaintiff is that *she* identified Bianchi on her own Rule 26 disclosures, Doc. 46-5 at 3 (Reply Ex. 5), and defendant did, in fact, disclose Bianchi in a supplemental Rule 26 disclosure, Doc. 46-6 at 3 (Reply Ex. 6). Plaintiff's complaint about interrogatories fares no better. One of her interrogatories asked defendant to identify all complaints coworkers made about plaintiff. Doc. 41-24 at 22 (Ex. W). In response, defendant disclosed Bianchi's notes from her interview with Larkin. *Id.* at 22–23 (identifying documents Bates-stamped 000396–000422 as

After Andrade left, Riggins hired his daughter to replace her. Doc. 41-5 at 4 (Riggins Dep. 18:5–19:4). Though Andrade had reported to Long, Riggins's daughter reported to him. *Id.* (Riggins Dep. 19:3–17). And to replace Larkin, Riggins hired his wife. *Id.* (Riggins Dep. 19:20–20:12). Riggins's wife reported to plaintiff, but plaintiff didn't participate in hiring her. *Id.* (Riggins Dep. 19:20–20:24). Plaintiff testified that, though Riggins's wife reported to her on paper, she didn't report to plaintiff in a functional sense. Doc. 38-2 at 28–29 (Pl. Dep. 120:24–121:16).

### *The Comment*

In May 2023, Riggins joined a conversation with plaintiff and three male sales employees. Doc. 41-4 at 15 (Pl. Dep. 215:17–216:6). The first word Riggins said to the group was inaudible, but that inaudible first word was followed by "is a dumb slut." *Id.* Riggins told plaintiff that the derogatory comment came from a Saturday Night Live sketch. *Id.* (Pl. Dep. 216:2–8). Plaintiff—upset by the comment—reported to Riggins's boss, Burdine-Fly, that Riggins had called her a "dumb slut." Doc. 41-3 at 18–19 (Burdine-Fly Dep. 47:13–48:3). Defendant's response to this asserted fact, perhaps sensing that this comment presents a huge problem, quibbles that plaintiff didn't hear Riggins say her name because she couldn't hear the first word he said. Doc. 46 at 9. But, at summary judgment, the court must adopt plaintiff's view of the facts and give her the benefit of all reasonable inferences from those facts. Given that plaintiff was the only woman participating in the conversation, a jury reasonably could infer that Riggins's derogatory comment targeted plaintiff.

---

responsive); Doc. 38-11 at 2 (Bianchi Decl. ¶ 6) (identifying declaration Exhibit A as her notes from her meeting with Larkin wherein Larkin said that plaintiff disrespected and bullied her); Doc. 38-11 at 4–6 (Bianchi Decl. Ex. A) (Bates-stamped 000401–02). The court thus overrules plaintiff's ill-informed objection.

Burdine-Fly, incensed, called Riggins.  Doc. 38-6 at 6 (Riggins Decl. ¶ 26).  Riggins disputed that he'd called plaintiff a derogatory name and explained the SNL sketch he'd referenced.  *Id.* (Riggins Decl. ¶ 27).  Riggins nonetheless told Burdine-Fly that he felt terrible. *Id.*  He agreed to apologize to plaintiff.  *Id.*  Burdine-Fly expressed her disappointment in Riggins, gave him a verbal warning, and explained that if he did something like this again, he'd lose his job.  *Id.* (Riggins Decl. ¶ 28).

The next day, Riggins spoke to plaintiff.  *Id.* (Riggins Decl. ¶ 29).  The ground covered in this conversation is hotly disputed.  Riggins maintains that he apologized to plaintiff.  *Id.* Plaintiff testified that Riggins never said he was sorry.  Doc. 38-2 at 34 (Pl. Dep. 218:16–18). Burdine-Fly checked in after this conversation, and Riggins told her that he'd apologized to plaintiff.  Doc. 38-8 at 3 (Burdine-Fly Decl. ¶ 11).  Burdine-Fly then called plaintiff.  *Id.*  The ground covered in this call is disputed as well.  According to Burdine-Fly, plaintiff told Burdine-Fly that she felt good about her conversation with Riggins.  *Id.*  Plaintiff testified that she told Burdine-Fly that she'd talked to Riggins, but she didn't tell Burdine-Fly that Riggins had apologized.  Doc. 41-4 at 16 (Pl. Dep. 218:25–219:18).  And plaintiff never told Burdine-Fly that she felt good about the conversation.  Doc. 41-26 at 4 (Pl. Aff. ¶ 17).

In June 2023, another one of plaintiff's direct reports, Lindsey Gutierrez, quit.  Doc. 38-6 at 6 (Riggins Decl. ¶ 30).  Gutierrez told Riggins that she was leaving because she couldn't work with plaintiff any longer.  *Id.* (Riggins Decl. ¶ 31).  She called plaintiff mentally abusive, condescending, and passive aggressive.  *Id.*  According to Riggins, Gutierrez also claimed that Larkin and Andrade had left the company because of plaintiff's treatment of her employees.  *Id.* Gutierrez also told the Regional Business Manager that she was leaving mostly because of plaintiff, complaining that plaintiff had lied, manipulated, and spoke to employees

disrespectfully.  Doc. 38-11 at 3 (Bianchi Decl. ¶¶ 9–10).  Gutierrez didn't mention any of these concerns in her resignation letter, however.  Doc. 41-19 (Ex. R).

In late June 2023, another one of plaintiff's direct reports, Sean Carter, told Riggins that he would quit if plaintiff's unprofessionalism and negative leadership style didn't change.[6]  Doc. 38-6 at 6–7 (Riggins Decl. ¶ 32).  Carter informed Riggins that another of plaintiff's direct reports—Tim Kolling—had quit in January 2023 because of plaintiff.  *Id.*  Plaintiff points out that Kolling's resignation letter doesn't blame plaintiff.  To the contrary, Kolling's resignation letter called plaintiff "amazing" and "absolutely wonderful . . . to work for."  Doc. 41-16 at 2 (Ex. O).  And, as footnote devotees already know, Carter himself had mixed feelings about plaintiff.  *See above* n.6.  In a message sent after plaintiff's termination, Carter told plaintiff he was "so sorry," greatly appreciated her help, and had "VERY MUCH enjoyed" their friendship.  Doc. 41-25 at 2 (Ex. X).

_____

[6]     Plaintiff tries to controvert this fact but doesn't succeed.  To controvert what Carter told Riggins in June 2023, she cites an email from February 2023.  Doc. 41 at 7 (citing Doc. 41-12 (Ex. K)).  In that email, a human resources employee recounts a February 6, 2023, interview with Carter.  Doc. 41-12 at 2 (Ex. K).  Plaintiff emphasizes that Carter, according to the email recounting, had many complaints about Riggins and, in contrast, he found plaintiff supportive.  *See id.*  Defendant raises a hearsay objection.  Doc. 46 at 10.  But it's not clear whether plaintiff is offering this statement for its truth.  Whatever her aim, the court just can't tell what this statement does for plaintiff.

    Even if the court did consider the email, something Carter said in February 2023 doesn't controvert something he said later, in June 2023—especially if the two statements are consistent.  Carter didn't exactly give plaintiff a glowing review in February 2023.  To the contrary, the email mentions that Carter said he "does struggle" with plaintiff.  Doc. 41-12 at 2 (Ex. K).  Carter also said that plaintiff "will always fight to the death for her sales staff, but . . . sometimes gets nasty."  *Id.*  And Carter told the human resources employee that plaintiff had talked to him "in an abusive/bullying way."  *Id.*  With this context in mind, Carter's February 2023 statement is consistent with his June 2023 statement and thus doesn't controvert the later statement.

    Plaintiff also cites a message Carter sent to her after her termination.  In it, Carter expressed his sorrow, his appreciation for her, and how much he's enjoyed his friendship with her.  Doc. 41 at 7–8 (citing Doc. 41-25 at 2 (Ex. X)).  In light of Carter's earlier, negative statements about plaintiff, these messages show merely that Carter had mixed feelings about plaintiff.  They don't controvert what Carter said to Riggins before plaintiff was fired.

Also in late June 2023, yet another of plaintiff's direct reports—Max Svoboda—quit. Doc. 38-6 at 7 (Riggins Decl. ¶ 33). Based on his conversations with Gutierrez and Carter, Riggins asked Svoboda why he was quitting, and Svoboda told Riggins he could no longer work with plaintiff. *Id.* Like the others, Svoboda's resignation letter didn't mention his issues with plaintiff. Doc. 41-20 at 2 (Ex. S). And plaintiff recalls Svoboda "was very teary-eyed" when submitting his resignation letter. Doc. 41-26 at 4 (Pl. Aff. ¶ 15).[7]

After his conversations with employees who'd quit, Riggins talked to two of plaintiff's current employees and, according to Riggins, both told Riggins about difficulties they'd had with plaintiff. Doc. 38-6 at 7 (Riggins Decl. ¶ 34). Riggins took these concerns—from five members of plaintiff's team he'd spoken with in June—to Burdine-Fly and Arville, the Director of Human Resources. *Id.* (Riggins Decl. ¶ 35). Burdine-Fly didn't review any documents or investigate these concerns on her own. Doc. 41-3 at 14 (Burdine-Fly Dep. 37:11–25). Riggins didn't share any notes or documents with Arville. Doc. 41-2 at 29 (Arville Dep. 141:5–19). And no one from human resources investigated Riggins's concerns. *Id.* (Arville Dep. 141:21–23).

After consulting with Arville, Burdine-Fly and Riggins jointly decided to terminate plaintiff's employment due to the significant turnover in her department and the repeated complaints about her conduct. Doc. 38-6 at 7 (Riggins Decl. ¶ 36). Defendant has a policy governing disciplinary procedures. It provides that, generally, defendant takes the following disciplinary steps: (1) first warning, (2) second warning, (3) termination. Doc. 38-13 at 2 (Ex. 12). Defendant terminated plaintiff's employment on June 30, 2023. Doc. 36 at 2 (PTO ¶ 2.a.v.). But defendant's policy provides that it "may skip or repeat any or all levels of

---

[7]    The court doesn't consider the rest of this paragraph from plaintiff's affidavit describing what Svoboda told her because, as defendant correctly observes, it's inadmissible hearsay.

discipline at its sole discretion, and initiate a termination with [or] without prior oral or written notice." Doc. 38-13 at 2 (Ex. 12).

## II.        Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material

issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671). Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.        Analysis

Plaintiff brings six claims: three under federal law and three under state anti-discrimination statutes. Doc. 36 at 13–15 (PTO ¶ 4.a.). Luckily, courts apply the same analysis to federal claims brought under Title VII and state law claims brought under the Kansas Act Against Discrimination. *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019). So, plaintiff's claims boil down to:

1. Sex discrimination

2. Retaliation

3.  Hostile work environment.

The court analyzes each, in turn, below.

### A.    Sex Discrimination

The court applies "the familiar *McDonnell Douglas* burden-shifting framework when assessing a motion for summary judgment on a claim of sex discrimination." *Throupe v. Univ. of Denv.*, 988 F.3d 1243, 1251 (10th Cir. 2021).  At the first step of this framework, "the plaintiff has the burden of presenting a prima facie case of discrimination." *Id.*  At the second step, the "burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Id.*  And, at the third and final step, plaintiff must show that "the employer's articulated reasons are pretextual." *Id.*

### 1.    Prima Facie Case

To make a prima facie case for a sex discrimination claim, plaintiff must present "evidence that:  (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (internal quotation marks and citation omitted).

It's undisputed that plaintiff belongs to a protected class.  That's step one.  And, in her summary judgment response, she has narrowed the universe of adverse employment actions to just one:  defendant terminating her employment.  Doc. 41 at 34.  Termination indisputably qualifies as an adverse action.  That's step two.  That leaves just the third step:  whether the circumstances surrounding plaintiff's termination give rise to an inference of discrimination. This analysis and the relevant evidence overlap with the pretext analysis, the court collapses this inference-of-discrimination inquiry into the pretext inquiry.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008) (explaining that "there is no proscription in an

appropriate case against using pretext evidence to support a prima facie case if it indeed gives rise to an inference of actionable discriminatory intent")

### 2.    Pretext

The parties agree.  Defendant has articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment:  significant turnover in the sales department under plaintiff's leadership and employee complaints.  Doc. 38 at 33; Doc. 41 at 35.  The burden thus shifts to plaintiff to demonstrate pretext.

If "a plaintiff presents evidence that the defendant's proffered reason for the employment decision was pretextual—i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation cleaned up).  To show pretext, plaintiff relies on Riggins's "dumb slut" comment—which came just one-and-a-half months before defendant fired plaintiff—and Riggins's refusal to apologize for the comment.  Doc. 41 at 35.

Our Circuit has held that "gender-based comments by a plaintiff's supervisor can be relevant evidence of pretext demonstrating that the supervisor had preconceived notions premised on the plaintiff's gender and ultimately terminated her based at least in part on his gender bias[.]"  *Plotke v. White*, 405 F.3d 1092, 1107 (10th Cir. 2005) (quotation cleaned up).  The important thing here is that Riggins made the comment about plaintiff *to* plaintiff.  "[R]emarks exhibiting bias which refer *directly to* the plaintiff may support an inference of discrimination."  *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996) (emphasis added).

Given that plaintiff's supervisor made a derogatory comment to her, plaintiff, to meet the pretext standard, "simply must show a nexus between the allegedly discriminatory statements and the employer's decision."  *Plotke*, 405 F.3d at 1107.  In *Plotke*, the plaintiff met this standard

(i) by demonstrating that the remarks "were specifically directed to or about" plaintiff and (ii) because one of the men making derogatory comments was plaintiff's supervisor, who recommended that plaintiff's employer not extend her employment beyond a probationary period. *Id.*

Plaintiff has met this "nexus" requirement. Viewing the facts in the light most favorable to plaintiff, a reasonable jury could find (or infer) that Riggins specifically directed the derogatory comment about plaintiff to plaintiff—the only woman in the conversation. And Riggins was plaintiff's supervisor. Then, some six weeks later, Riggins decided to terminate plaintiff. So, a reasonable jury could infer from Riggins's remarks that unlawful gender bias motivated Riggins's decision to terminate her employment.

Defendant insists that this cannot be right. Doc. 46 at 22. Defendant points out that a woman—Burdine-Fly—participated in the decision to terminate plaintiff's employment, dispelling any stench of pretext because Burdine-Fly belongs to the same protected class as plaintiff. *Id.* Yet Burdine-Fly participated minimally in the decision, the summary judgment facts show. Riggins served as the main conduit for complaints about plaintiff and as the driver behind the decision to fire her. All complaints from the four employees who left in 2023 came from Riggins. Doc. 41-3 at 10 (Burdine-Fly Dep. 29:9–21); *see also* Doc. 38-6 at 3–7 (Riggins Decl. ¶¶ 9–11, 16–18, 31–35). After gathering these complaints, Riggins took them to Burdine-Fly and Arville, and Riggins and Burdine-Fly ultimately decided to terminate plaintiff's employment. *Id.* at 7 (Riggins Decl. ¶ 36).

It's true, Riggins and Burdine-Fly made the decision jointly.[8] *Id.* But Burdine-Fly testified that she didn't review any of the documents Riggins sent her. Doc. 41-3 at 14 (Burdine-

---

[8]     Perhaps sensing the problem that Riggins poses, defendant tries to demonstrate a degree of independence in the decision to terminate plaintiff. Defendant points out that the concerns Riggins raised

Fly Dep. 37:11–17). She didn't ask Riggins for any proof. *Id.* (Burdine-Fly Dep. 37:18–21).

And she didn't call anyone to verify what Riggins had said. *Id.* (Burdine-Fly Dep. 37:22–25).

So, not only was Riggins *a* decisionmaker—a jury reasonably could find that he was *the*

decisionmaker. *See EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 485 (10th Cir.

2006) (describing a "rubber stamp" theory in which a decisionmaker "followed the biased

recommendation of a subordinate without independently investigating the complaint against the

employee." (quotation cleaned up)).

What's more, plaintiff has adduced some evidence calling Riggins's account of events

into question. Though four employees left the company, none of their resignation letters

mentions plaintiff as the reason for their departure. Doc. 41-17 at 2 (Ex. P); Doc. 41-18 at 2 (Ex.

Q); Doc. 41-19 at 2 (Ex. R); Doc. 41-20 at 2 (Ex. S). Plaintiff asserts that Riggins never

provided her with any documented employee complaints. Doc. 41-26 at 5 (Pl. Aff. ¶ 19). And

so, plaintiff has created a triable issue about some of her employees' views of her.

For example, according to Riggins, Carter told him that Kolling quit because of plaintiff.

Doc. 38-6 at 6–7 (Riggins Decl. ¶ 32). But Kolling's resignation letter called plaintiff "amazing"

and "absolutely wonderful . . . to work for." Doc. 41-16 at 2 (Ex. O). And while Riggins states

that Carter threatened to quit because of plaintiff, Doc. 38-6 at 6–7 (Riggins Decl. ¶ 32), plaintiff

has adduced evidence that Carter reached out to plaintiff after her termination, saying she had

---

weren't new because two employees who had left the company in 2023—Andrade and Larkin—had
complained to Arville about plaintiff. Doc. 38 at 16. But Arville didn't make the decision to terminate
plaintiff—Riggins and Burdine-Fly made it. Nor is it clear from the record whether Arville ever told
Riggins about the complaints by Andrade and Larkin. *See, e.g.*, Doc. 38-9 at 3 (Arville Decl. ¶¶ 10–12)
(testifying only that Arville had received complaints from Andrade and Larkin that matched Riggins's
concerns and that she agreed with the decision to terminate plaintiff's employment). Construing this
ambiguity in the record in plaintiff's favor, the court must infer that Arville didn't share Andrade and
Larkin's complaints with Riggins and Burdine-Fly. So, at summary judgment, the court must assume that
Riggins drove the decision.

made him "a better person and market consultant" and he'd "VERY MUCH enjoyed" their friendship.  Doc. 41-25 at 2 (Ex. X).  Riggins also claims Svoboda quit because he couldn't work with plaintiff any longer, Doc. 38-6 at 7 (Riggins Decl. ¶ 33), but plaintiff recalls Svoboda submitted his resignation letter with tears in his eyes, Doc. 41-26 at 4 (Pl. Aff. ¶ 15).  Lindquist, who didn't quit, complained about Riggins, not plaintiff—and called plaintiff "such a great manager."  Doc. 41-11 at 2 (Ex. J).

In a final heave, defendant emphasizes that Riggins "was involved in hiring Plaintiff, recommended she be promoted to replace the previous male Director of Sales, gave her a glowing performance evaluation, provided her with praise for doing a good job, and recommended that she receive an increase in her bonuses."  Doc. 46 at 22.  Sure, a jury might take this evidence to suggest that Riggins didn't harbor unlawful biases.  But other evidence—namely, the derogatory comment he made about plaintiff to plaintiff—suggests just the opposite.  And this competing evidence is fatal to defendant's motion because "at the summary judgment stage the judge's function is not himself to weigh the evidence[.]"  *Anderson*, 477 U.S. at 249.

In sum, construing the facts in the light most favorable to plaintiff, a reasonable jury could find that Riggins called plaintiff a derogatory name because he is biased against women, and his bias has infected every part of the case.  And so a reasonable factfinder could find defendant's reason for firing plaintiff "unworthy of belief" and conclude that Riggins terminated plaintiff at least in part based on gender bias.  *See Kendrick*, 220 F.3d at 1230 (quotation cleaned up).

### B.    Retaliation

Title VII bars employers from retaliating against employees who have "opposed any practice made an unlawful employment practice by [Title VII], or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

VII]."  42 U.S.C. § 2000e-3(a).  "A plaintiff may prove a Title VII retaliation claim through

circumstantial evidence under the *McDonnell Douglas* burden-shifting framework."

*Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th

1321, 1339 (10th Cir. 2025).  That means, as before, that the court starts with plaintiff's prima

facie case.

　　　"To establish a prima facie case of retaliation, a plaintiff must show that:  (1) she engaged

in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal

connection between the protected activity and the adverse action."  *Id.* (quotation cleaned up).

Plaintiff claims two protected activities:  reporting Riggins's Employee Warning Notice to the

executive and reporting Riggins's "dumb slut" comment to Burdine-Fly.  Doc. 41 at 27.  For the

second element, plaintiff again focuses on her termination.[9]  Doc. 41 at 28.  And defendant

doesn't challenge plaintiff's prima facie case.  Doc. 38 at 35 (assuming that plaintiff can

establish her prima facie case and asserting perfunctorily that she can't but moving on to pretext

anyway).

　　　At *McDonnell Douglas*'s second step, defendant must articulate a non-discriminatory

reason for firing plaintiff.  As mentioned above, it has done so successfully, asserting it fired

plaintiff because of the complaints about her and the turnover in her team.  The burden thus

shifts to plaintiff to demonstrate pretext.

　　　To demonstrate pretext, plaintiff relies on the same evidence already recounted as support

for her discrimination claim.  *See* Doc. 41 at 29–31.  Because a reasonable factfinder could

---

[9]　　　Plaintiff's brief on this point is confusing.  She kicks off her discussion on this subject by
claiming a variety of adverse employment actions beyond termination.  *See* Doc. 41 at 27.  But then she
clarifies that those other adverse employment claims support her hostile work environment claim, not her
retaliation claim.  *Id.* at 28.  The court thus takes plaintiff at her word when she recites that her
"termination forms the basis of her stand-alone retaliation claim."  *Id.*

discredit defendant's nondiscriminatory reason, the court denies defendant's summary judgment motion against this claim. *See Walkingstick Dixon*, 125 F.4th at 1340 (concluding retaliation claim survived summary judgment because plaintiff's pretext evidence was the same for discrimination claim and discrimination claim survived).

### C.    Hostile Work Environment

Plaintiff's final claim alleges that defendant subjected her to a hostile work environment. A "'plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.'" *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)). To survive summary judgment on a hostile work environment claim, "'a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.'" *Id.* (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). To support her hostile work environment claim, plaintiff relies on the following facts:

- The "dumb slut" comment, for which Riggins never apologized;

- Riggins yelling at plaintiff;

- Riggins hiring his family members in violation of defendant's policies and having them report to him, circumventing plaintiff's supervision; and

- Riggins moving his office next to plaintiff to monitor her closely.

Doc. 41 at 39. To evaluate this claim, the court need only consider the second element of a hostile work environment claim: severe or pervasive.

The Tenth Circuit has explained "that pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim."

*Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation cleaned up).  But pervasiveness and severity "'are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.'"  *Id.* (ellipsis in original) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

When making the severity or pervasiveness determination, a court must evaluate the totality of the circumstances.  *Throupe*, 988 F.3d at 1252.  The court must "'consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* (quoting *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012)).  A plaintiff doesn't demonstrate a sufficiently pervasive or severe hostile work environment with "a few isolated incidents" unless those "isolated incidents are in themselves 'severe.'"  *Morris*, 666 F.3d at 666.  "[W]hether the conduct was severe or pervasive is typically a question for the jury," but summary judgment nonetheless is appropriate when "the plaintiff fails to make" a severe or pervasiveness showing.  *Throupe*, 988 F.3d at 1252.

When evaluating hostility, the court must ensure that its review does not turn Title VII into a "general civility code."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation cleaned up).  Conduct "that is merely offensive" doesn't violate Title VII.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Instead, Title VII only prohibits conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]"  *Id.*

Start with pervasiveness.  The pervasiveness problem plaintiff faces is the multi-year gap between incidents.  Riggins moved his office close to plaintiff in 2019, when he issued the

20

Employee Warning Notice.  *See* Doc. 46-2 at 2 (Reply Ex. 1).  Plaintiff also alleges that Riggins threatened her on multiple occasions, though the only specific incident she testified about was an incident near in time to the Employee Warning Notice.  Doc. 41-4 at 11 (Pl. Dep. 135:15–136:4).  Plaintiff testified that Riggins came into her office, slammed the door, and, red in the face, told her not to come for his job.  *Id.*  After these incidents came a three-and-a-half-year lull.  The hiring of Riggins's wife and daughter occurred in 2023, as did the derogatory "dumb slut" comment.  In sum, that's four incidents during plaintiff's five-year employment, with a three-and-a-half-year gap separating some of them.  No reasonable factfinder could find this pervasive.  *See Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1365–66 (10th Cir. 1997) (concluding that "five separate incidents of allegedly sexually-oriented, offensive comments either directed to [plaintiff] or made in her presence in a sixteen month period" were not pervasive).

    And, finally, consider severity—an alternative ground to sustain a hostile work environment claim.  To qualify as sufficiently severe, plaintiff must point to conduct that "objectively altered the terms and conditions of [her] employment."  *Morris*, 666 F.3d at 668.  The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]"  *Faragher*, 524 U.S. at 788.  To satisfy this requirement, plaintiff asserts that two incidents changed the terms and conditions of her employment:  (1) Riggins undermining her supervisory authority by hiring his wife and daughter and having them report to him and (2) Riggins terminating plaintiff's employment after she complained about the "dumb slut" comment.[10]  Doc. 41 at 39.  Neither can clear the "high bar required for a hostile work environment claim[.]"  *Iweha v. Kansas*, 121 F.4th 1208, 1223 (10th Cir. 2024).

---

[10]    The court reads plaintiff's briefing to focus on these two events for her severity argument only—not all four facts recited above.  That's so because plaintiff argues that only these two events changed the terms and conditions of her employment.  Even if the court considered the other two facts—Riggins

No reasonable factfinder could find the wife-and-daughter issue qualifies as extreme. Plaintiff doesn't explain how this incident undermined her authority and nothing in the record suggests that other members of plaintiff's team knew about the arrangement. The arrangement didn't last long. Riggins's daughter worked for defendant for two months, and his wife worked there for ten days. Doc. 41-5 at 6 (Riggins Dep. 25:6–26:3). True, these arrangements might have violated defendant's policies, but Title VII isn't a "general civility code" designed to adjudicate "the ordinary tribulations of the workplace[.]" *Faragher*, 524 U.S. at 788 (quotation cleaned up). This petty dispute falls short of a basis for finding a hostile work environment.

That just leaves the slur, and the slur alone. With just this one incident left, plaintiff faces an uphill climb. "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotation cleaned up). Assuming Riggins made his derogatory comment to plaintiff, it was reprehensible. But the single comment doesn't qualify as extremely serious conduct sufficient to show a hostile work environment under our Circuit's precedent. In *Chavez*, the Circuit held that "two racially offensive remarks . . . fall far short of the 'steady barrage' required for a hostile environment claim."[11] 397 F.3d at 832. And so, a single sexist comment falls short of the standard, too.

Defendant thus is entitled to summary judgment against plaintiff's hostile work environment claim.

---

yelling at plaintiff and moving his office closer to hers—its conclusion wouldn't change. Neither of these incidents clears the high bar for hostile work environment claims.

[11]    The Supreme Court considers it proper and "good sense" to consult racial hostile work environment cases when considering sexual hostile work environment cases. *Faragher*, 524 U.S. at 787 n.1.

**IV.        Conclusion**

The court denies defendant's Motion for Summary Judgment (Doc. 37) against plaintiff's claims for sex discrimination and retaliation.  The court grants the motion against plaintiff's hostile work environment claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 37) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 6th day of November, 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
